COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                       NOS.
 2-04-410-CR

        2-04-411-CR

 

 

JOHN STEWART DELONG                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

Appellant John Stewart DeLong
appeals from his convictions for three counts of indecency with a child and one
count of aggravated sexual assault of a child. 
Because we hold that the trial court abused its discretion by excluding
the testimony of Appellant=s expert witness on Afalse memories,@ we reverse
and remand both cases for new trials.

 








                                            Background

Appellant does not challenge
the sufficiency of the evidence; therefore, we will limit our overview of the
evidence to that necessary to put Appellant=s complaints into context. 
Appellant was charged by three separate indictments with aggravated
sexual assault of a child and indecency with a child, and the three cases were
tried together.  The three complainants
were H.W., S.K., and J.W.[1]

H.W. testified that Appellant
was her next-door neighbor and penetrated her vagina with his fingers while she
was swimming in his pool when she was six or seven years old.  She testified the Appellant repeatedly
assaulted her in the same manner over the course of two summers.  H.W. disclosed the abuse to a friend at her
eighth birthday party in 1994, and the friend told H.W.=s parents.  H.W.=s parents confronted Appellant about H.W.=s allegations, and she stopped going over to Appellant=s house.  H.W. next reported the
alleged abuse to personnel at Cook Children=s Medical Center in 2001 when she was fourteen years old. 








J.W. testified that her
mother had an off-and-on dating relationship with Appellant.  J.W. occasionally spent the night at
Appellant=s house when
she was between five and ten years old. 
She said that Appellant would rub her back when he put her to bed and
usually rubbed her buttocks, too.  J.W.
testified that on one occasion when Appellant was helping J.W. put on her
swimsuit, he touched her sex organ. 

S.K. is the daughter of a
former employee of Appellant=s.  She testified that she was a
frequent visitor in Appellant=s home.  S.K. said that
Appellant assaulted her on three occasions in 1993 when she was 13:  once while she was swimming in his pool, once
in his living room while she and Appellant watched a movie, and once in a
bedroom while she was spending the night at Appellant=s home. 

Of particular significance to
this appeal are the circumstances under which the complainants made their
outcry statements.  H.W. was the first
complainant to make an outcry statement. 
In February 2001, while she was being examined at Cook Children=s Medical Center in connection with an unrelated incident, H.W. stated
that Appellant assaulted her years earlier. Hospital personnel reported H.W.=s outcry to the police as required by law, and Detective Patrick
Ripley of the Bedford Police Department began an investigation. 








On May 17, 2001, J.W. and her
mother, Jennifer Todd, were visiting at Appellant=s house.  Appellant=s wife at the time of trial, Rebecca,[2]
testified that she returned home from an errand to find Todd and H.W.=s mother having an animated discussion in front of Appellant=s and H.W.=s adjacent
homes.  She said she approached the women
and asked them what was going on, but they refused to speak to her.  Angered, Rebecca entered her and Appellant=s home and told Appellant that she did not want J.W. and her mother to
visit Appellant=s home
anymore; J.W. was present and heard Rebecca=s outburst.  Todd entered the
home, and Appellant Amade it
clear that she needed to leave.@ Todd went back outside and resumed her conversation with H.W.=s mother for another fifteen minutes, then left with J.W. 








As Todd and J.W. drove away
from Appellant=s house
immediately following this incident, Todd told J.W. that Appellant had been Ainappropriate@ with H.W.
and asked J.W. if Appellant had ever been inappropriate with her.  J.W. said that Appellant had rubbed her back
and that he had Arubbed too
low.@  Todd then told J.W. that
Appellant had touched several girls inappropriately and asked J.W. whether
Appellant had ever showed her his penis, to which J.W. answered, ANo, mom.@  Next, Todd told J.W. that Appellant had put
his fingers in H.W.=s vagina;
J.W. said that Appellant had not done that to her. 

That night or the next day,
Todd called Detective Ripley, whose name she obtained from H.W.=s mother.  Detective Ripley told
Todd to take J.W. to the Alliance for Children, where she was interviewed by a
counselor outside of Todd=s
presence.  When Todd and J.W. returned
home, J.W. told Todd that Appellant had touched her pubic area. 

H.W.=s mother also gave S.K.=s name to Detective Ripley. 
Detective Ripley interviewed S.K. at her place of employment on May 30,
2001.   Detective Ripley told her that
Appellant had Abeen doing
inappropriate things to girls,@ and asked if Appellant had ever touched her inappropriately.  Detective Ripley told S.K. that H.W. was one
of the girls in question.  S.K. denied
that Appellant had molested her.  After
her work shift ended, S.K. drove to H.W.=s house and talked to H.W.=s mother.  H.W.=s mother convinced S.K. to call Detective Ripley and Atell him the truth.@  H.W.=s mother telephoned Detective Ripley, and S.K. told him that Appellant
had done Ainappropriate
things.@ 








On June 30, 2001, Detective
Ripley interviewed S.K. again.  This
time, S.K. told Detective Ripley that Appellant had assaulted her in his living
room and in his swimming pool.  She also
told him that Appellant had entered her bedroom on one occasion when S.K. was
sleeping over at Appellant=s house, but she did not indicate that Appellant had molested her
then.  Detective Ripley asked S.K. to
give him a written statement.  He allowed
her to prepare the written statement at home, rather than at the police
station, and she worked on her five-page handwritten statement for several
days.  In the written statement, S.K.
alleged, for the first time, that Appellant assaulted her when she slept over
at his house. 








Appellant offered Dr.
Elizabeth Loftus as an expert on the phenomenon of Afalse memories@ to show
that the complainants= allegations
and the circumstances surrounding their outcry statements were consistent with
the false-memory phenomenon.  Outside the
presence of the jury, Dr. Loftus testified that she is a psychologist who
specializes in the area of cognitive psychology and, more specifically, the
area of human memory and suggestibility. 
She has studied human memory since the 1960s and has published articles,
papers, and textbooks on the subject since the early 1970s. Dr. Loftus said
that she has conducted hundreds of experiments on human memory involving over
20,000 subjects; many of the experiments involved suggestibility.  Her curriculum vitae includes a list of her
peer-reviewed and other publications, most on the subject of memory and many on
suggestibility.[3]
Appellant offered three of those publications, all on the subject of false
memories, to the trial court.  After a
hearing under rule of evidence 702, the trial court excluded Dr. Loftus=s testimony.  We will discuss
Dr. Loftus=s proposed
testimony in greater detail later in this opinion.

The jury found Appellant not
guilty on three counts alleging various sexual offenses against H.W.  It found him guilty of two counts of
indecency with a child by fondling with regard to S.K. and one count each of
aggravated sexual assault of a child and indecency with a child with regard to
J.W.

                                             Discussion

In his first point, Appellant
argues that the trial court erred by excluding the testimony of Dr. Elizabeth
Loftus.  The gist of the testimony that
Appellant sought to elicit from Dr. Loftus is that false memories can be
induced in the mind of a witness under circumstances similar to those
surrounding the outcry statements of the complainants in this case.  The State objected to her testimony as
irrelevant.  Ultimately, the trial court
excluded her testimony. 








Rule 702 of the Texas Rules
of Evidence provides that Aif scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise.@  Tex. R. Evid. 702. 
Under Rule 702, the proponent of scientific evidence must show, by clear
and convincing proof, that the evidence he is proffering is sufficiently
relevant and reliable to assist the jury in accurately understanding other
evidence or in determining a fact issue. 
Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)
(citing Nenno v. State, 970 S.W.2d 549, 560-61 (Tex. Crim. App.
1998)).  

Thus, Appellant=s first point comprises two questions: Is evidence like Dr. Loftus=s false-memory testimony generally relevant, and is Dr. Loftus=s testimony reliable?  We will
consider each question in turn.[4]

                                           A.  Relevance








Expert testimony, like all
evidence, is not admissible unless it is relevant.  See Tex.
R. Evid. 402, 702.  An expert may
not testify that a particular witness is being truthful or lying.  See Yount v. State, 872 S.W.2d 706,
711 (Tex. Crim. App. 1993).  Rather,
expert testimony is limited to situations in which the expert=s knowledge and experience on a relevant issue are beyond that of an
average juror.  Id. at 710‑11.  There is a Afine but essential@ line between helpful expert testimony and impermissible comments on
credibility.  Schutz v. State, 957
S.W.2d 52, 60 (Tex. Crim. App. 1997) (quoting State v. Myers, 382 N.W.2d
91, 98 (Iowa 1986)).[5]  Expert opinion must aidCnot supplantCthe jury=s decision.  Id. at 59.

Expert opinion does not
assist the jury if it constitutes Aa direct opinion on the truthfulness@ of a complainant=s allegations.  Id.
(quoting Yount, 872 S.W.2d at 708). 
ATruthfulness@ encompasses
nonmoral as well as moral considerations. 
Id. at 59, 68.  For example,
a child complainant who has been exposed to manipulative pressure from others
may knowingly make false allegations (a moral consideration) or may have been
manipulated into believing that certain false allegations are actually true (a
nonmoral consideration).  Id. at
60.  In order for a person=s recitation of events to be true, the events described must be both
honestly related and accurately perceived and remembered.  Id. at 68-69.  While neither honesty nor accuracy guarantees
truthfulness by itself, each is nevertheless a direct comment on truthfulness,
and both constitute particularized testimony concerning the alleged victim=s credibility.  Id. at
69.













AEven so,
psychologists and others in the mental health profession have much expertise in
the area of human behavior that can be of assistance to a fact‑finder.@ Id. For example, the court of criminal appeals has recognized
expert knowledge concerning the behavioral characteristics typically exhibited
by sexual abuse victims.  Id.
(citing Cohn v. State, 849 S.W.2d 817 (Tex. Crim. App. 1993)).  And in Shutz, the court of criminal
appeals noted that whether a child exhibits signs of manipulation is similar to
whether a child exhibits signs of sexual abuse, because both involve behavioral
manifestations of external influence or events acting upon the child.  Id. 
The court recognized that, as with signs of sexual abuse, experts may
also have specialized knowledge regarding signs of coaching, coercion, and
suggestion, which they may impart to the jury. 
Id.  But credibility issues
such as whether allegations have been fantasized or whether a child has in fact
been manipulated will often involve both psychiatric and psychological
information about mental illness and human behavior as well as unspecialized
knowledge within the purview of lay jurors. 
Id.  Once an expert imparts
her scientific, technical, or specialized knowledge to the jury concerning
either area within her expertise, Ajurors are just as capable as the expert in drawing conclusions
concerning the credibility of the parties in issue.@  Id. (quoting Yount,
872 S.W.2d at 710).  Thus, Schutz
concluded, evidence of manipulation or fantasy, whether relating to mental
capacity or moral disposition, should be analyzed under the same rules that
govern evidence of truthful or untruthful character.  Id. at 69.

Rule of evidence 608(a)
permits a party to attack a witness=s general capacity or disposition to tell the truth.  Id.; Tex.
R. Evid.  608(a).  General capacity evidence includes whether a
person can distinguish between reality and fantasy, and an expert may provide
such testimony.  Schutz, 957
S.W.2d  at 67-70.  But evidence that a complainant=s specific allegation is the result of fantasy or manipulation is
inadmissible unless the party against whom the evidence is offered Aopens the door.@  Id. at 71.  Such evidence never assists the jury because
the jury is just as capable as the expert of drawing the conclusions
involved.  Id. at 70-71.








In Schutz, after an
exhaustive review of relevant law from other jurisdictions, the court of
criminal appeals identified five categories of general and specific evidence
that touch on a complainant=s credibility in child sexual-abuse cases and set out the
circumstances under which each category of evidence is admissible:  (1) substantive evidence of guilt that
incidentally impacts on credibility (admissible during offering party=s case-in-chief); (2) general testimony relating to impaired witnesses
or declarants (admissible during offering party=s case-in-chief if impaired person is expected to be a witness or
declarant); (3) general testimony that directly attacks credibility (admissible
during offering party=s
case-in-chief to attack credibility of witness or out-of-court declarant); (4)
general testimony that supports credibility (admissible as rebuttal to attacks
on credibility so long as there is a loose fit between the rebuttal evidence
and the predicate attacks on credibility); and (5) specific testimony
supporting or attacking credibility (may be admitted only to rebut other
specific testimony attacking or supporting credibility and only if there is a
tight fit between the rebuttal testimony and the previous specific testimony
attacking or supporting credibility).  Id.
at 75-76.

The testimony of two experts
was at issue in Schutz.  The first
was a psychologist who testified about the characteristics of children who have
been manipulated and who equated fantasizing with lying.  Id. at 58.  The second was a psychologist who testified
that the complainant had in fact not been manipulated and that her allegations
were not the result of fantasy.  Id.  The court held that the first expert=s testimony on the characteristics of children who have been
manipulated was admissible because it did not constitute a direct comment on
the truth of the complainant=s allegations.  Id. at
73.  But the first expert=s testimony equating fantasizing with lying and the second expert=s testimony that the complainant had not been manipulated and was not
fantasizing  were inadmissible because
they constituted direct comments on the truthfulness of the complainant=s allegations.  Id.








In this case, Dr. Loftus
testified that a false memory is an untrue memory that the witness or complainant
nonetheless believes to be true.  She
explained that a false memory can be very detailed, and a person who has a
false memory can be very confident and even emotional about the false memory.  Dr. Loftus testified that she could not say
whether a particular person is lying or that a particular memory is a false
memoryCin other words, that she could not comment directly on the
truthfulness of a complainant=s allegationsCbut she
could say whether the circumstances indicated suggestion of the sort that can
lead to a false memory.  








Appellant=s counsel posed a series of hypothetical situations to Dr. Loftus that
tracked the circumstances surrounding the complainants= outcry statements.  In her
opinion, it was Acertainly
possible@ that the circumstances surrounding H.W.=s outcry were consistent with the formation of false memories of the
sexual abuse she reported, that J.W.=s outcry was Aabsolutely@ consistent with suggestion and memory contamination, and that there
was a Amajor worry@ about
suggestibility with respect to S.K.=s outcryCespecially
because she denied any abuse in her first interview with police, but then
alleged abuse after she spoke with other witnesses.  Dr. Loftus said that the circumstances
surrounding J.W.=s outcry
paralleled the methodology she used in the laboratory to induce false memories
in test subjects. 








Of the five categories of
credibility evidence identified in Schutz, Dr. Loftus=s false-memory testimony best fits into the third category, general
testimony that directly attacks credibility. 
An example of general testimony that directly attacks credibility listed
by court of criminal appeals includes testimony about the common symptoms or
traits of a child who is fantasizing or being manipulated coupled with
testimony that the child in question exhibits some or all of those symptoms or
traits.  Id. at 75.  Such testimony is Ageneral@ in the
sense that it does not comment on the truthfulness of the specific allegations
made by the complainant.  Dr. Loftus=s testimony was likewise general. 
She testified that she could not say that any particular allegation was
false, but could say that the circumstances surrounding the complainants= outcries were consistent with the creation of false memories.  Thus, Dr. Loftus=s false-memory testimony was general testimony that directly attacked
the complainants=
credibility, and such evidence is admissible during the offering party=s case-in-chief.  See id.;
see also Wright v. State, Nos. 01-05-00597-CR, 01-05-00598-CR,
01-05-00599-CR, 2006 WL 2076148, at *8 (Tex. App.CHouston [1st Dist.] July 27, 2006, no pet. h.) (holding defense
counsel ineffective for failing to secure expert testimony Aregarding false allegations of sexual assault occurring after a
divorce and the accepted protocols for interviewing suspected child sexual
assault victims,@ which would
have been admissible under Schutz); Segura v. State, No.
03-03-00685-CR, 2005 WL 2313559, at *4 (Tex. App.CAustin Sept. 23, 2005, no pet.) (not designated for publication)
(noting that expert testimony on false memory and Amemory hardening@ admitted
without objection); Ard v. State, No. 05‑02‑01915‑CR,
2004 WL 1813753, at *2 (Tex. App.CDallas Aug. 16, 2004, pet. ref=d) (not designated for publication) (noting admission without
objection of psychologist=s testimony
on how memory can be influenced or altered).

At trial, the State argued
that Dr. Loftus=s testimony
was irrelevant to any question before the jury because Dr. Loftus testified that
she could not say whether a witness was lying or whether any particular memory
was a false memory.  That argument turns
the relevancy analysis on its head because, as we have already observed, an
expert may not testify that a particular witness is being truthful.  See Yount, 872 S.W.2d at 711.

We hold that Dr. Loftus=s false-memory testimony was general evidence that directly attacked
the complainants= credibility
and was, therefore, relevant and admissible during Appellant=s case-in-chiefCprovided
that her opinion was shown to be reliable.








                                            B.  Reliability

The reliability of Asoft@ science
evidence, such as Dr. Loftus=s false-memory testimony, may be established by showing that (1) the
field of expertise involved is a legitimate one, (2) the subject matter of the
expert=s testimony is within the scope of that field, and (3) the expert=s testimony properly relies on or utilizes the principles involved in
that field.[6]  Weatherred, 15 S.W.3d at 542.  Rule 702 Aimposes a special gatekeeping obligation on the trial court to make
sure the expert testimony is reliable.@  Henderson v. State, 77
S.W.3d 321, 324 (Tex. App.CFort Worth 2002, no pet.).  We
review a trial court=s ruling on
the admissibility of evidence, including expert testimony, under the
abuse-of-discretion standard.  Weatherred,
15 S.W.3d at 542.








The trial court conducted a
gatekeeper hearing outside the presence of the jury.  Dr. Loftus explained how she applies the
scientific method to her work by developing a hypothesis, designing an
experiment to test the hypothesis, conducting the experiment, testing the
validity of the resulting data, and submitting the results for publication in a
peer-reviewed journal.  She testified
that the experimental techniques and methodologies she employs are generally
accepted within the field of psychology and are so fundamental that they are
taught to virtually every student of introductory psychology.  Dr. Loftus said that there are hundreds of
other psychologists conducting similar scientific research in the field of
human memory.  As a member of the
peer-review editorial boards of Asix or eight@ scientific
journals, she reviews and evaluates manuscripts submitted by other scientists
in the field.  Dr. Loftus described the
results of experiments that she and other scientists have conducted on the
creation of false memories, and false memories of traumatic childhood events in
particular, in test subjects. 








Applying the three-part
reliability test articulated in Nenno and Weatherred, we conclude
that Appellant established the reliability of Dr. Loftus=s Asoft@ science evidence.  Dr. Loftus=s testimony showed that her field of expertise is a legitimate one as
reflected by the sheer number of peer-reviewed articles she has published on
the subject of memory in general and false memories in particular.  The subject matter of her proposed testimonyCwhether the circumstances surrounding the complainants= outcry statements raised the specter of false memoriesCfalls squarely within the scope of that field.  Finally, Dr. Loftus=s opinions were based on the similarities between the facts of this
case as reflected in counsel=s hypothetical questions  and
the published data from controlled, peer-reviewed experiments conducted in
accordance with established scientific methodologies; thus, Dr. Loftus showed
that her testimony properly relied on or utilized the principles involved in
her field of expertise.

The State cites several
scholarly publications on the subject of Arepressed@ and Arecovered@ memories
and argues that a lack of consensus in the field renders Dr. Loftus=s opinions unreliable.  We
reject this argument for two reasons. 
First, Appellant presented Dr. Loftus as an expert on false memories,
not repressed or recovered memories; thus, the publications cited by the State
are not relevant to our analysis.  Second,
and more importantly, none of the articles cited by the State were provided to
the trial court and are not a part of the appellate record; thus, those
publications could not have informed the trial court=s discretion and likewise play no role in our analysis of the trial
court=s exercise of that discretion.








Dr. Loftus=s testimony stands in stark contrast to the testimony of other
putative experts in cases in which appellate courts have determined that a
trial court did not abuse its discretion by excluding an expert=s testimony.  In Weatherred,
the putative expert testified that he and others had carried out extensive
research on the subject of his expertise and that he had written much on the
subject, but he failed to produce or even name any of the studies, research, or
writings in question.  Weatherred,
15 S.W.3d at 542-43.  In Mims v. State,
the Tyler court of appeals held that the trial court did not abuse its
discretion by excluding the testimony of a psychologist when less than
one-tenth of the psychologist=s practice involved the subject of her testimony; she had written just
one article on the subject, and the article had not been published or
peer-reviewed; and she had done no research on the subject.  No. 12-02-00178-CR, 2004 WL 949453, at *6
(Tex. App.CTyler April
30, 2004, pet. denied) (mem. op.) (not designated for publication).

Having concluded that Dr.
Loftus=s false-memory testimony was both relevant and reliable, we hold that
the trial court=s decision
to exclude Dr. Loftus=s testimony
was so clearly wrong as to lie outside that zone within which reasonable
persons might disagree and constituted an abuse of discretion.  See Cantu v. State, 842 S.W.2d
667,  682 (Tex. Crim. App. 1992), cert.
denied, 509 U.S. 926 (1993).

 

 

 

 

                                        C.  Harm Analysis








Having found error, we must
conduct a harm analysis to determine whether the error calls for reversal of
the judgment.[7]  Tex.
R. App. P. 44.2.  Generally, the
erroneous exclusion of evidence is nonconstitutional error governed by rule
44.2(b) if the trial court=s ruling merely offends the rules of evidence.  See Solomon v. State, 49 S.W.3d 356,
365 (Tex. Crim. App. 2001).  Appellant
concedes that the error was nonconstitutional; thus, we will apply rule 44.2(b)
and disregard the error if it did not affect Appellant=s substantial rights.  Tex. R. App. P. 44.2(b); see Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999); Coggeshall v. State,
961 S.W.2d 639, 642-43 (Tex. App.CFort Worth 1998, pet. ref=d).








A substantial right is
affected when the error had a substantial and injurious effect or influence in
determining the jury=s
verdict.  King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States,
328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); Coggeshall, 961 S.W.2d
at 643.  When the claimed error is the
exclusion of a relevant piece of evidence, as is the case here, conducting a
meaningful harm analysis would necessarily require consideration of all evidence
which was admitted at trial.  See
Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

We have considered all of the
evidence that was admitted at trial.  In
addition to the evidence summarized above, the following evidence is
potentially relevant to our harm analysis. 
In its case in chief, the State offered the testimony of L.W.[8]  L.W. testified that her parents were friends
of Appellant=s and that
her father was in business with Appellant for a time.  She testified that on one occasion when
Appellant and his wife at the time, Ginger DeLong, spent the night in L.W.=s parents= guest house
and L.W. slept in the same bed with Appellant and Ginger, Appellant inserted
his finger into L.W.=s
vagina.  Ginger DeLong testified that
although she occasionally spent the night at L.W.=s parents= house when
Appellant was away on business, she and Appellant never spent the night there
together, and she and Appellant never slept in the same bed with L.W.
anywhere.  L.W.=s father was involved early on in Detective Ripley=s investigation of Appellant. 








In its rebuttal case, the
State offered the testimony of J.S.  J.S.
testified that in 1980, when J.S. was seven years old and her mother was dating
Appellant, Appellant inserted his fingers into J.S.=s vagina while carrying her Apiggy back.@  J.S. testified that this happened on three to
five occasions.  J.S. testified that she
did not know L.W., the complainants, or their families.  Appellant denied having molested J.S.  J.S=s. testimony, isolated as it is from the circumstances surrounding the
complainants= outcry
statements, arguably weighs against Appellant=s theory that the complainants= outcry statements resulted from false memories.  On the other hand, the jury could believe her
testimony and still conclude that the complainants= outcry statements described false memories.








The case was hotly
contested.  In all, twenty witnesses
testified over an eight-day period in the guilt-innocence phase.  Eight of those testified for the State, ten
testified for Appellant, and Appellant called two as hostile witnesses.  Appellant cross-examined all of the State=s witnesses extensively in an effort to show the unreliability of
their testimony.  Because there was no
physical or other corroborative evidence, the outcome of the trial hinged
entirely on whom the jury believedCthe complainants or Appellant. 
The defense=s theory at
trial was that the complainants= allegations were false. 
Without Dr. Loftus=s testimony,
Appellant could not attempt to prove that the complainants made unintentionally
false allegations; he could only attempt to show that they were intentionally
lying, an altogether more difficult prospect and one in which Appellant
ultimately failed.  As we noted above,
the First District Court of Appeals recently held that counsel was ineffective
for failing to offer precisely this kind of expert testimony touching on the
credibility of a complainant.  Wright,
2006 WL 2076148, at *8.  If believed by
the jury, Dr. Loftus=s testimony
could have had a substantial effect or influence on the jury=s verdict because it cut to the very heart of a case in which the only
evidence of guilt was the testimony of the complainants.  Thus, the exclusion of her testimony had a
substantial and injurious effect or influence on the jury=s verdict and affected a substantial right of Appellant=s.  We therefore conclude that
the trial court=s error was
harmful, and we sustain Appellant=s first point.

                                             Conclusion

Having sustained Appellant=s first point, we remand these cases to the trial court for a new
trial.  We do not reach Appellant=s remaining points.   See
Tex. R. App. P. 47.1.

 

 

ANNE GARDNER

JUSTICE

 

PANEL A:   CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

 

CAYCE, C.J., dissents without opinion.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  November 16, 2006











[1]H.W.
and J.W. are not related.





[2]Appellant
married Rebecca after he stopped dating Todd.





[3]We
note that the supreme court cited extensively several of Dr. Loftus=s
publications on the subject of memory in S.V. v. R.V., 933 S.W.2d 1,
16-19 (Tex. 1996).





[4]We
note that the State=s
brief does not address the question of relevance but focuses solely on the
question of reliability.





[5]Schutz is
the leading case in Texas on the admissibility of expert testimony concerning
credibility in sexual-assault cases, but surprisingly neither party discusses
or even cites Schutz.





[6]The Ahard@
sciences, areas in which precise measurement, calculation, and prediction are
generally possible, include mathematics, physical science, earth science, and
life science; the Asoft@
sciences, in contrast, are generally thought to include such fields as
psychology, economics, political science, anthropology, and sociology.  Weatherred, 15 S.W.3d at 542 n.5.





[7]The
State=s
brief does not address harm with regard to Dr. Loftus=s
excluded testimony.





[8]L.W.
is not related to H.W. or J.W.